**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

EDGE SYSTEMS LLC

       Plaintiff,

vs.

CARTESSA AESTHETICS, LLC

       Defendant.

Case No. 2:20-cv-06082-GRB
Hon. Gary R. Brown

**DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT OF NON-INFRINGEMENT OF THE 052 PATENT AND MEMORANDUM OF LAW**

i

4876-1197-4201.v1

## **TABLE OF CONTENTS**

I.    THE LAW GOVERNING SUMMARY JUDGMENT............................................1

II.   PLAINTIFFS CANNOT DEMONSTRATE INFRINGEMENT OF US PATENT NO. 9,550,052 ("'052 PATENT")..............................................................2

A.    SUMMARY JUDGMENT OF NON-INFRINGEMENT IS PROPER IF ANY LIMITATION IS NOT FOUND IN THE ACCUSED DEVICE ...........................2

B.    THE ACCUSED DEVICE DOES NOT MEET THE MANIFOLD LIMITATIONS.................................................................................................2

C.    THE MANIFOLD MUST "CONTROL" FLUID FLOW. THE WHITE MOUNT – THE ALLEGED MANIFOLD – DOES NOT EXERCISE CONTROL...............16

D.    THE CLAIMS ARE WRITTEN SUCH THAT THE END USER IS THE DIRECT INFRINGER. ....................................................................................17

A.    ANY "SYSTEM" THAT IS CREATED SUCH THAT "WHEN THE VACUUM SOURCE IS OPERATED" A "SUCTION FORCE IS CREATED," "WASTE [IS] REMOV[ED]" AND "TREATMENT MATERIAL [IS] DRAWN" ONLY IN THE HANDS OF THE ULTIMATE USER. ..................................................17

1.    This case is controlled by *Cross Medical Products v. Medtronic* .17

2.    The treatment-related clauses are limiting, and all limitations must be met for infringement. ........................................................18

3.    The final system is not accomplished by Cartessa.........................19

III.   CONCLUSION.............................................................................................20

4876-1197-4201.v1

# TABLE OF AUTHORITIES

## Cases

*Allergan Sales, LLC v. Sandoz, Inc.*, 935 F.3d 1370, 1376 (Fed. Cir. 2019)................................ 19

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986).................................................... 1

*Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1048 (Fed. Cir. 2016) .................................... 2

*Bradium Techs. LLC v. Iancu*, 923 F.3d 1032, 1045 (Fed. Cir. 2019) ......................................... 10

*CA, Inc. v. Simple.com, Inc.,* 780 F. Supp. 2d 196, 208 (E.D.N.Y. 2009).................................... 1

*Cross Medical Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293 (Fed. Cir. 2005)................................................................................................................. 17

*Desenberg v. Google, Inc.*, 392 F. App'x 868, 871 (Fed. Cir. 2010) ........................................... 19

*Desper Products, Inc. v. QSound Labs, Inc.,* 157 F. 3d 1325, 1332 (Fed. Cir. 1998) ................................................................................................................................. 1

*ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 520 (Fed. Cir. 2012) .................................... 4

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1580 (Fed. Cir. 1996) ................................................................................................................................. 8

*Mich & Mich TGR, Inc. v. Brazabra, Corp.,* 128 F. Supp. 3d 621, 629 (E.D.N.Y. 2015) ................................................................................................................................. 1

*PC Connector Solutions LLC v. SmartDisk Corp.,* 406 F.3d 1359, 1364 (Fed. Cir. 2005) ................................................................................................................................. 2

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ............................................................. 13

*Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.,* 563 F.3d 1358, 1369 (Fed. Cir. 2009) ................................................................................................................................. 2

*Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1368 (Fed. Cir. 2005)............................... 8

*Voice Techs. Grp., Inc. v. VMC Sys., Inc.*, 164 F.3d 605, 615 (Fed. Cir. 1999).......................... 10

*Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir. 1993) ........................................ 1

## Rules

Fed. R. Civ. P. 56(c) .................................................................................................................... 4

4876-1197-4201.v1

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Cartessa Aesthetics Inc. moves for summary judgment on the issues discussed herein.

## I.    THE LAW GOVERNING SUMMARY JUDGMENT

"The court applies the same summary judgment standards to patent infringement matters as it does to motions involving other types of claims." *Mich & Mich TGR, Inc. v. Brazabra, Corp.,* 128 F. Supp. 3d 621, 629 (E.D.N.Y. 2015) (J. Matsumoto); *Desper Products, Inc. v. QSound Labs, Inc.,* 157 F. 3d 1325, 1332 (Fed. Cir. 1998). Thus, a court may grant summary judgment in a patent case "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.*; Fed. R. Civ. P. 56(c).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986) (emphasis in original).  No genuine issue of fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Id.* at 249-50.

Therefore, "[i]n order to defeat a motion for summary judgment supported by proof of facts that would entitle the movant to judgment as a matter of law, the nonmoving party is required under Rule 56(e) to set forth specific facts showing that there is a genuine issue of material fact to be tried." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir. 1993). The nonmoving party may not "rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible, or upon the mere allegations or denials of the nonmoving party's pleading." *Id.* at 532-33.

1

## II.   PLAINTIFFS CANNOT DEMONSTRATE INFRINGEMENT OF US PATENT NO. 9,550,052 ("'052 PATENT")

### A.   Summary judgment of non-infringement is proper if any limitation is not found in the Accused Device

"Summary judgment on the issue of infringement is proper when no reasonable jury could find that every limitation recited in a properly construed claim either is or is not found in the accused device either literally or under the doctrine of equivalents." *PC Connector Solutions LLC v. SmartDisk Corp.,* 406 F.3d 1359, 1364 (Fed. Cir. 2005). With respect to literal infringement, there can be no infringement if the accused devices do not literally embody every limitation of the claim. *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.,* 563 F.3d 1358, 1369 (Fed. Cir. 2009). Thus, if even a single limitation is missing literally, even if there is an equivalent, there can be no infringement. *PC Connector,* 406 F.3d at 1364.

### B.   The Accused Device does not meet the manifold limitations.

Plaintiff cannot meet its burden to make a *genuine* issue of material fact that the mount is a manifold. The parties agree a manifold is well known, then Edge promptly ignores that and substitutes in a nontechnical dictionary definition to justify its infringement position, against Federal Circuit guidance. Under Edge's incorrect framework it has presented no evidence of infringement of this element. Cartessa is entitled to summary judgment of non-infringement of all claims of the '052 Patent, at least because Cartessa provides "the only reasonable view of the claim element." *See Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1048 (Fed. Cir. 2016).

a.   The parties agree that the "manifold" dispute is subject to summary disposition.

Cartessa sought summary judgment on the manifold matter, and the Court found it should be briefed. Ex. A, Dkt. 069, Ex. B, Dkt. 085. Each claim of the '052 Patent requires a "manifold" being in "fluid communication" with multiple containers. Ex. C, '052 Patent at Cl. 1, 11.  Because

2

each of the independent claims requires a manifold, and because each dependent claim incorporates all the limitations of the independent claims, if the Accused Device does not meet the manifold limitation, it does not infringe any claim of the '052 Patent because it "do[es] not literally embody every limitation of [any] claim." *Revolution Eyewear*, 563 F.3d at 1369.

Edge previously stated that this disagreement between the parties is a "purely legal dispute" that the "Court may resolve on summary judgment." Ex. D, Dkt. 073.1 at 2. This is because Edge and Cartessa "do not dispute how the accused device works." *Id*. at 1. With respect to the facts relevant to the manifold and the Court's ability to rule on this motion, Cartessa agrees.

      b.  The Accused Device draws fluid from a single container at a time, controlled through energized solenoid valves individually selected. The Accused Device cannot select from more than one container at a time.

The Accused Device has multiple containers and can draw fluid from only one at a time. At the head of each container are solenoid valves, with one such solenoid per container. Ex. E, Exp. Dec. M. Jensen at ¶¶169-170; Ex. F, Dep. M. Jensen at 210:22-211-7; Ex. G, Dep. R. Meyst at 107:12-110:9. The solenoids are held in place by a mount, which likewise holds the conduit to the handset. *See* Ex. H, Exp. Rpt. R. Meyst at 77 (including images of same). The solenoids are the only operable component that allows for selection from the containers.

The Accused Product cannot draw from multiple fluid containers simultaneously because of the solenoid arrangement. The solenoids are "selectively open[ed] to allow fluid from one container to be drawn to treatment, *but never more than one at a time*." Ex. F, Dep. M. Jensen at 212:2-11(emphasis added). Dr. Jensen determined this from both physically testing the Accused Device and reviewing the manual. Ex. E, Exp. Dec. M. Jensen at ¶¶166-¶168; Ex. I, CARTESSA_0000343-344 at 21. Plaintiff agrees. Ex. G, Dep. R. Meyst at 45:16-45:20; 98:24-9:14; Ex. J, Exp. Rpt. R. Meyst at 130. During use, a user selects a treatment from a screen, a solenoid is energized, and the path from the container is opened. Ex. E, Exp. Dec. M. Jensen at

3

¶168. A vacuum is activated which then circulates the fluid. *Id.* Dr. Jensen explains how this process is controlled through the operation of solenoid valves. *Id.* at ¶¶169-170. Upon selection of a subsequent treatment, the first solenoid is deenergized and closes, a second one is energized, and the fluid from that second container is circulated in the same way. *Id.* At no time are fluids drawn from multiple containers simultaneously. *Id.* There is no override of the solenoids. *Id.* at ¶171.

> c.  The manifold term as used in the '052 Patent requires the ability to simultaneously deliver fluid through multiple conduits.

The Court did not construe manifold, and as such it is given its plain and ordinary meaning. *See ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 520 (Fed. Cir. 2012). Cartessa's expert looked at several sources of information to understand this term: known manifolds, the '052 patent specification, dictionary definitions, engineering expertise, and concurrent writings.

Relevant to this motion, the evidence is that the ordinary meaning of manifold is an object that (1) is a pipe with multiple inlets and several outlets; and (2) allows for dividing fluids from a single source into multiple outlets or combining multiple sources into a single outlet. Ex. O, Exp. Rep. of M. Jensen ¶39, Ex. G, Dep. R. Meyst 83:13-24. While the parties agree on the former, Defendant provides unrebutted evidence of the latter.

> i.  The parties agree that a manifold is well known, with the offered example being one that allows for simultaneous fluid communication through multiple conduits.

The '052 Patent claims a multi-modal product, capable of delivering from one or multiple containers at once, and this is enabled by the manifold. The prototypical manifold is an intake manifold or an exhaust manifold in an automobile with an internal combustion engine, which takes air from a single source and splits it into the various cylinders or combines exhaust from various cylinders and routes it for expulsion. Ex. K, Exp. Rpt. R. Meyst at ¶53. This type of a manifold, which both parties agree is the prototypical example of a manifold, has both of the two key aspects

4876-1197-4201.v1

discussed above: they are enclosed spaces for a plurality of fluid paths, *and* they allow for combination of fluids to or from different routes.

ii.    The specification supports that "manifolds" as used in the '052 Patent means the plain and ordinary meaning of a device capable of simultaneous flow through multiple conduits.

The specification describes the manifold as capable of drawing fluids from multiple containers. It shows the fluid containers capable of being drawn simultaneously. Ex. C, '052 Pat. Fig. 15A-E; *id*. at 6:15-18 (device can provide "sequentially or simultaneously" applied fluid); Ex. L, Dep. R. Ignon at 187:25-188:3 (the patent "is [] talking about different containers both transmitting fluid at the same time"). The manifold routes fluid from the containers in one of two ways: either through lumen 171 or channel 173, depending on activation of an on/off switch. Ex. C, '052 Pat. at 18:1-6. This allows "the fluid from one or more of the upstream bottles" to be fed "into the line 20" to the handpiece. *Id*. Through this technique the manifold, the device can provide treatment material from "multiple containers 26 [] sequentially or simultaneously." *Id*. at 6:15-18. There are switches associated with the containers, each one opening at least one corresponding container, which allows for the treatment media to be combined for usage. *Id.* at 17:5-15 (embodiment with one switch per container); *see also id*. at 17:13-17 (embodiment in which one switch controls multiple bottles). This allows for the fluids from different containers to intermix during use. Ex. L, Dep. R. Ignon at 188:23-189:4.

iii.    Edge's product that falls under the '052 Patent has a manifold that allows for simultaneous flow through multiple conduits.

The product covered by the '052 Patent operates such that the manifold can provide multiple modes of function—either from a single container or multiple containers. The Hydrafacial Tower is configured to allow for fluid to come from any number of containers simultaneously, according to the inventor. Ex. L, Dep. R. Ignon at 110:15-111:14 ("Q Was it possible in the

5

HydraFacial Tower to draw liquid out of two bottles simultaneously? A It could be done. . . . There are individual switches for each – each canister, and two switches could be in the 'on' position."). Testimony repeatedly confirmed the same. *See e.g., id*. at 187:25-189:4; 189:11-15; 190:5-19.

Dr. Jensen analyzed the Hydrafacial Tower and concluded the same. Ex. E, Exp. Dec. M. Jensen at ¶¶45-49. There is a switch for each bottle, and multiple switches can be toggled to access fluids in each. Increasing vacuum strength allowed this functionality. *Id*. at ¶48-49.

> iv.    The remaining language of the independent claims supports that simultaneous flow through multiple conduits is required.

The claim structure supports a reading that a manifold is to draw from multiple containers simultaneously. First, the manifold is in "fluid communication" with multiple containers. The claim uses "and":  the manifold is in fluid communication with a first "and" a second container. Ex. C, '052 Pat. at Cl. 1 (Claim 11 states fluid communication with at least two containers). As Mr. Ignon and Mr. Shadduck – skilled artisans writing patents at the critical time – agree, fluid communication *ends* upon closing a valve. *See* Ex. M, Dep. J. Shadduck at 112:18-23 ("[Y]ou turn the valve and two areas . . . are no longer in fluid communication with each other; correct? . . . A "You've just defined a valve, yes."); Ex. L, Dep. R. Ignon at 164:9-25 ("If [the valves] are closed," two areas are on either side of the valve are "not in fluid communication"). Accordingly, a manifold in fluid communication with a first "and" second container must have open fluid pathways to each container because if it did not, they simply would not be in fluid communication.

Second, a *separate* limitation allows one to select among the containers. *See* Ex. C, '052 Pat. at 21:37-40. Contrasting the manifold limitation's use of "and," the limitation related to individual selection uses "or": the system permits selection from "the first container *or* the second container." *Id*. (emphasis added). The dependent claims state the same. *See e.g., id*. at Cl. 2.

6

> v. The different language used in Claims 5, 10, and 17 support that the independent claims must allow for simultaneous flow through the conduits.

The difference between Claims 5, 10, and 17 on the one hand and Claims 1 and 11 on the other further supports the understanding that independent Claims 1 and 11 require actual fluid communication instead of potential fluid communication with a plurality of containers. Claim 5 utilizes language that speaks to the *potential* to place the manifold in fluid communication with containers, which Claim 1 lacks.[1] The relevant language of Claim 1 is below:

> a manifold, the manifold being in fluid communication with a first fluid container and at least a second fluid container,

The relevant language of Claim 5 is below, which differs in that the manifold is configurable *to be placed* in fluid communication.

> 5. The system of claim 1, wherein the manifold is configured ***to be placed*** in fluid communication with at least four fluid containers.

The contrasting language is meaningful. Claim 5 speaks in terms of potential fluid communication; the manifold need not always be in fluid communication, but merely "place[able]" in such an arrangement. That is, the containers can be separated from the manifold by the structures enabled by the '052 Patent to *end* fluid communication, *e.g.*, a switch operating a valve. *See* Ex. C, '052 Pat. at 17:5-17. The "to be placed" language speaks of some action that would convert the containers between two states: one of which is and one of which is *not* in fluid communication. In the disclosed embodiment, that action through the valve-controlled switch. *Id*.

Claim 1 is missing the "potential" language entirely; the claim recites that the manifold <u>is</u> in fluid communication ("being in fluid communication"). The language does not indicate the manifold toggles between two states. If the language of Claim 1 had the meaning Plaintiff attempts

---

[1] The same is true with respect to Claims 10 and 17, in which the manifold is "configured *to be placed* in fluid communication with a container comprising [disinfectants]." '052 Patent at claims 10, 17 (emphasis added).

4876-1197-4201.v1

to ascribe to it today – that the "manifold being in fluid communication" referred to potential instead of actual fluid communication – then the "to be placed" language in Claim 5 is surplusage. That is, Claim 5 would have been written as "the manifold is . . . in fluid communication with at least four containers" or "the manifold is configured [for] fluid communication with at least four fluid containers." The Court should give meaning to the wording: the manifold limitation of Claim 1 does not have multiple states; it has a single state of being in fluid communication. The intentional choice of different wording should be meaningful: Different claim language is presumed to have different meanings, and "the plain meaning the claim will not bear that [different terms] are synonyms." *See Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1580 (Fed. Cir. 1996). *See also Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1368 (Fed. Cir. 2005) (different words or phrases used in separate claims are presumed to have different scope). Said another way, Plaintiff reads the "to be placed" language into Claim 1 by contending that there is no obligation that the manifold be in present fluid communication with a plurality of containers.

> vi.   The prosecution history shows a limitation other than the manifold language allows for drawing from a single container.

The prosecution history supports a reading that the manifold allows for simultaneous drawing of fluid because the language that allowed for drawing from multiple containers simultaneously is found in the issued claims. First, the manifold limitation existed in the claims as offered after a preliminary amendment, prior to examination. *See* Ex. N, '052 File History, EDGE-CARTESSA_0001667-68 at claims 2 and 7. Original claim 7 further limited claim 2, which claimed that the manifold was in fluid communication with at least "two containers." *Id*. Both these claims were rejected over art called Coleman on a novelty basis. *Id*. at EDGE-CARTESSA_0001711. The notes from the examiner on a personal interview on July 30, 2015, and office action of March 7, 2016, show that that language (which included the manifold language

8

attached to multiple bottles) allowed flow from multiple containers. To avoid Coleman, the examiner suggested that the applicant add language that would "permit a user to *individually/independently* select the treatment material from the first fluid container or the at least second fluid container." *Id.* at EDGE-CARTESSA_0001750, 0001789 (emphasis in original). As such, the original language was understood to allow for drawing from multiple containers and additional language was needed to draw from an individual container. Second, language allowing drawing from a single container was added. Acknowledging "the Personal Interview of July 30, 2015", the patentee amended, incorporating the limitation of claim 7 into claim 2, cancelling claim 7, and adding language allowing "a user to select the treatment material from the first fluid container or the at least second fluid container." *Id.* at EDGE-CARTESSA_0001759-1760. The language of claim 2 and 7 propagated through to the final claim – the same "manifold" language that was understood to allow for drawing from multiple containers.

As a consequence, the language that was always understood to mean that the manifold could draw from multiple containers exists in the final claims. The applicant's addition of language to allow for the selection of a single container does not negate that the multi-container language still exists in the claims. As a result, the claims (like the product it covers) are "multi-modal;" they allow for drawing from one container or mixing treatment materials from multiple.

> vii. Testimony from the inventors of both the '052 Patent and the Shadduck patents regarding terms used in the claims support the understanding that a manifold must be able to have fluid flow through a plurality of conduits simultaneously.

The testimony of the inventor of the '052 Patent supports that the manifold must be in actual fluid communication with multiple fluid containers. As Roger Ignon testified, he understood fluid communication (the term used in the independent claims of the '052 Patent) not to be a discussion of *potential ability* for fluid flow, but *actual ability* for fluid flow. As the inventor of

4876-1197-4201.v1

the '052 Patent agreed, if a valve is closed, two areas are not in fluid communication.

> Q    Do -- do you know what "fluid communication" means?
>
> A    Uh-huh.
>
> Q    Does it -- can a valve cut off fluid communication?
>
> A    It could, yeah.
>
> Q    So, so long as the valves are open, they're in fluid communication.  If they're closed, it's not in fluid communication; correct?
>
> MR. RAZAI:   Objection; form, foundation.
>
> THE WITNESS:   I would assume so, yeah.

Ex. L, Dep. R. Ignon at 164:9-25. According to the inventor of the claim at issue, if the valves are closed, two areas are on either side of the valve are "**not in fluid communication**." As such, a manifold with valves incapable of being opened to a first and second fluid container cannot be a "manifold being in fluid communication with a first container and a second container."

The testimony above twice confirms Cartessa's position. In the first instance, Mr. Ignon agreed that valves cut off fluid communication. In the second, he agreed that the existence of fluid communication depends on valve state. A "manifold being in fluid communication with a first container and a second container" must have open paths to both, otherwise they would "not [be] in fluid communication." The Federal Circuit has endorsed relying on inventor testimony to understand the meaning of certain claim terms to an ordinarily skilled artisan. *See, e.g.*, *Bradium Techs. LLC v. Iancu*, 923 F.3d 1032, 1045 (Fed. Cir. 2019); *Phillips*, 415 F.3d at 1317 ("[W]e have also authorized district courts to rely on extrinsic evidence, which consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises"); *Voice Techs. Grp., Inc. v. VMC Sys., Inc.*, 164 F.3d 605, 615 (Fed. Cir. 1999).

viii.   Expert testimony supports the understanding that a manifold must allow for simultaneous flow of fluids.

Expert testimony indicates that manifolds can draw fluids from a plurality of sources, including the ability to mix fluids from multiple sources. Dr. Jensen, with a Ph.D. degree, Dr.Med. degree, and B.Sc. engineering degree, relied on his knowledge as an engineer and specialization in the medical field, work experience in engineering firms, his work as a professor, the contents of dictionaries, other patents, the intrinsic and extrinsic record, to understand the meaning of "manifold" from the perspective of an ordinarily skilled artisan. Ex. E, Exp. Dec. M. Jensen at ¶3-10, ¶16-22, ¶23; Ex. O, Exp. Rpt. M. Jensen at ¶23, ¶37, ¶39. Because "manifold" was not construed, Dr. Jensen applied the plain and ordinary meaning. Ex. E, Exp. Dec. M. Jensen at ¶52. From that understanding, Dr. Jensen provides an explanation of a manifold consistent with an understanding that they draw from multiple containers. Ex. F, Dep. M. Jensen at 215:22-216:17 (a manifold is "a structure that either combines a liquid fluid or gas from multiple sources into one common line, or does the opposite, has a common line to supply multiple outlets. . .").

While Mr. Meyst knew little about manifolds, he agrees (1) that manifolds route fluids "continuously" and (2) that he cannot think of any manifolds that support Edge's understanding – that they do not allow for combination of fluids. *Id.* at 32:3-32:17 ("Q The key word I'm trying to say is 'continuously.' There's nothing in there that blocks it, right? A. I don't believe so."); *id.* at 64:1-12 (all manifolds Meyst knows of allow for the combination of fluids).

d.   Plaintiff only relies on the non-technical dictionary definition of manifold, even while its experts admit such an understanding is not correct.

Plaintiff initially did no analysis of manifold, then retroactively contended it was applying an online dictionary definition exclusively. There is no attempt to understand the manifold in the initial infringement report. Mr. Meyst simply points to the mount and labels it a manifold. *See* Ex. H, Exp. Rpt. R. Meyst at 77. Mr. Meyst confirmed that no effort went into determining the mount

11

was a manifold. He acknowledges that he has little knowledge of manifolds, and even if he did, he acknowledges he performed no testing to determine the alleged manifold's function, he had no ability to determine the flow paths inside, no knowledge of its internal makeup, and no knowledge of its utility. Indeed, he is not certain he ever even touched the alleged manifold. Ex. G, Dep. R. Meyst at 80:1-81:21; 84:15-24; 111:22-112:2; 112:2-7; 113:18-24.

Dr. Jensen provided his opinion on validity. Dr. Jensen discussed manifolds to understand the term. He viewed many sources of information, including at non-technical dictionary definitions, which he deemed "helpful." Ex. O, Exp. Rpt. M. Jensen at ¶37. The two non-technical definitions Dr. Jensen provided were that manifold is "a pipe or closed space in a machine that has several openings, allowing liquids and gases to enter and leave" or "a pipe with one inlet and several outlets or with one outlet and several inlets, for connecting with other pipes." *Id*. Dr. Jensen did not contend these the definitions provide complete descriptions of this "well-known" object. Nor could they be complete – the definitions differ from each other and describe different features.

After Dr. Jensen served his explanation of a manifold, which included the dictionary definitions, Plaintiff began its *post hoc* justification of its position as though it was based on the dictionary definition that *Dr. Jensen* provided. Ex. G, Dep. R. Meyst at 36:6-12 (alleging he applied the dictionary definition in his analysis, which was nowhere in his report). Further, Edge (inaccurately) claims that the parties agree that the dictionary definition is the POSITA's understanding in this case. *See, e.g.*, Ex. P, Dkt. 073 at 1; Ex. D, Dkt. 073.1 at ¶8.

Because of this over-reliance on the non-technical dictionary definition, Plaintiff disputes fundamental aspects of a manifold simply because it is not recited in the dictionary definition. *See* Ex. D, Dkt. 073.1 at ¶9. Plaintiff disagrees with Dr. Jensen because "[t]hat is not part of the ordinary meaning of 'manifold,' *as expressed in the dictionary*." *Id*. (emphasis added).

12

i. Reliance on overbroad nontechnical dictionary definitions is contrary to patent law.

The seminal patent claim construction case, *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*), rejects the exact argument being made by Plaintiff: mere recitation of the contents of a nontechnical dictionary cannot substitute for a skilled artisan's understanding.

*Phillips* states the general principal that terms must be given "their ordinary and customary meaning" which is the meaning "the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312-1313. *Phillips* rejects simplified analysis based on "[g]eneral dictionaries, in particular," which "**cannot** overcome art-specific evidence." *Id.* at 1321, 1322 (emphasis added). *Phillips* overruled cases which "give[] greater emphasis to dictionary definitions." *Id*. at 1319; *see id.* at 1321 (criticizing "heavy reliance on the dictionary divorced from the intrinsic evidence"). This is because the patentee and the dictionary editor have different goals: the former is defining an invention; the latter is conducting the linguistic task of "aggregating all possible definitions." *Id.* at 1321. With "[g]eneral dictionaries, in particular," it is "inevitable" that the definition "will extend beyond the construction of the patent that is confirmed by the avowed understanding of the patentee." *Id.* at 1321-1322.

The *Phillips* court captured the problem with Plaintiff's argument: a general-purpose dictionary "simplif[ies] ideas to communicate them most effectively to the public" and thus provides a "meaning that is not pertinent to the understanding of particular claim language." *Id.* at 1322; *see also id*. at 1321 ("elevating the dictionary to such prominence . . . focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent."). This "systematically cause[s]" terms to be "unduly expansive." *Id*. at 1321.

ii. The non-technical dictionary provides an overbroad definition of a well-known device such as a manifold, and Plaintiff's expert agrees.

The nontechnical definition of manifold is a brief overbroad statement designed to

13

efficiently communicate an idea to the general public, not to provide an ordinarily skilled artisan's understanding of the term. *See Phillips* at 1322. It cannot be relied upon for infringement analysis. Importantly, Mr. Meyst agreed, and conceded things as broad as a garden hose splitter would fit within the dictionary definition, which was admittedly not a manifold.

Taking a non-technical definition in isolation relies on editors' attempts to "simplify ideas to communicate them most effectively to the public" and thus may provide a "meaning that is not pertinent to the understanding of particular claim language." *See Phillips*, 415 F.3d at 1322. By example, the same dictionaries relied upon by Plaintiff define a number of things in such a way that even an ordinary, nonskilled person would understand the definitions are unsuitably broad for technical analysis. Examples are endless: under Plaintiff's understanding, salmon, catfish, and perch are carp[2], yogurt is cheese[3], shotgun pellets are bullets[4], and waffle cones, cinnamon rolls, and chocolate chip cookies are cake.[5] Yet no skilled artisan would call the former the latter. General purpose dictionaries cannot substitue for the knowledge of a person of ordinary skill.

Reliance on a non-technical dictionary is particularly inappropriate here. First, *the parties agree that a manifold is a well-known device.* Plaintiff itself provided the prototypical example. Second, the inadequacy of the online dictionary definition Plaintiff uses was confirmed by Plaintiff's expert. Mr. Meyst was shown an ordinary garden hose splitter. *See* Ex. Q, Dep. R. Meyst at 42:13-43:23.  He agreed that the garden hose splitter fell within the same non-technical dictionary definition that Plaintiff relies on as a manifold, but that a garden hose splitter

---

[2] https://www.collinsdictionary.com/dictionary/english/carp ("A carp is a kind of fish that lives in lakes and rivers").

[3] https://dictionary.cambridge.org/dictionary/english/cheese ("a food made from milk, or from a milk-like substance taken from plants, that can be either firm or soft and is usually yellow or white in colour").

[4] https://dictionary.cambridge.org/dictionary/english/bullet ("a small, metal object that is shot from a gun").

[5] https://dictionary.cambridge.org/dictionary/english/cake ("a sweet food made with a mixture of flour, eggs, fat, and sugar").

14

nonetheless is not a manifold. Ex. Q, Dep. R. Meyst 43:14-23. Mr. Meyst agreed that a flute, despite having multiple openings and outlets that transmits air, was not a manifold. *Id.* at 40:3-23.

Mr. Meyst agreed for the very reason *Phillips* articulated that non-technical dictionaries cannot be the sole source of information on a structure—a claim is to be read by an ordinarily skilled artisan, not as some generic dictionary word in the abstract. Mr. Meyst acknowledged this.

> Q: "[A]n ordinarily skilled artesian [*sic* – artisan] is not just going to just rely on the dictionary definition to determine whether or not something is a manifold, correct?
>
> A   That's correct.

Ex. Q, Dep. R. Meyst at 44:6-10.

> iii.   Plaintiff provides no other colorable evidence that the mount is a manifold.

Plaintiff relies entirely on *ipsi dixit* expert testimony for evidence that the mount is a manifold. The infringement report by Mr. Meyst simply points to the mount and labels it a manifold. Ex. H, Exp. Rpt. R. Meyst at 77. No documentary evidence, no testing, and no admissions from Cartessa's personnel supports Plaintiff's belief that the white mount is a manifold.

No documents support Plaintiff's position. As could be expected regarding the mount, no documentary evidence refers to it as a "manifold," none use some language that could be interpreted as utilizing the mount as a manifold, and none describes it as having the function of a manifold. No testing supports Plaintiff's position. Plaintiff did not perform any analysis to understand if it was a manifold. The expert does not know if he even touched the object, did no destructive testing of it, did not unfasten it to inspect to object, does not know how it is structured on the interior, does not know what it is made of, and does not know who took the pictures in his report. Ex. G, Dep. R. Meyst at 80:16-84:24. No qualified expertise supports Plaintiff's position. Edge does not offer a competent expert on manifolds. Dr. Duboys makes no effort to opine on any

15

4876-1197-4201.v1

engineering aspect of the Accused Device and depends entirely on Mr. Meyst. While Mr. Meyst was able to offer the automobile manifold as the prototypical example, he was unfamiliar with them and was not able to describe their design or function. *See* Ex. Q, Dep. R. Meyst at 61:5- 65:24 (does not know the structure inside of a manifold, does not recognize the heads on the runners, does not know operation of manifolds, does not know flow paths).

### C. The manifold must "control" fluid flow. The white mount – the alleged manifold – does not exercise control.

Even if one were to agree the mount could be a manifold, Edge cannot show evidence that the mount controls flow. Both independent claims require that the "manifold is configured to control" fluid flow. Ex. C at 21:27-30 (Cl. 1), 22:36-39 (Cl. 11). Plaintiff provides no evidence of this, and in fact admits that the *solenoids* control the flow.

Dr. Jensen explains at length the solenoid matrix that controls the fluid flow, as operated by the user on a touch screen. Ex. E, Exp. Dec. M. Jensen at 43 and ¶169-170. Examples of "control" in the '052 Patent include, *e.g.*, increasing or decreasing flow rate by opening and closing ports. '052 Pat. at 8:43-53. Mr. Meyst correctly acknowledges that the mount simply holds the solenoid, and it is the *solenoid* that "control[s]" the fluid flow through opening and closing ports.

> Q   BY MR. TEPERA:  And what purpose does the white object serve with respect to the solenoid valves?
>
> A   Well, the white object I'm assuming is the manifold and it has a location for **a solenoid valve to be attached to it to control the opening and the closing**.

Ex. G, Dep. R. Meyst at 84:1-25 (emphasis added). The mount holds the solenoids, and the solenoids operated by the user control the flow. Importantly, Mr. Meyst acknowledges that a manifold – a well-known device as agreed by the parties – and solenoids are not the same thing. *Id*. at 82:19-21 ("To be clear, your answer is no, a solenoid valve and a manifold are not the same, correct? A That's correct.").

4876-1197-4201.v1

Edge does not provide evidence otherwise. Instead, Mr. Meyst alleges the existence of "[w]ires" that run between the "electrical components" and the "manifold" to give user control. Ex. H, Exp. Rpt. R. Meyst at 85. He never identifies these wires or the electrical interconnection that link to *the manifold*. *See id*. In reality, of course, the connections go to the solenoids.

**D. The claims are written such that the end user is the direct infringer.**

      **a. Any "system" that is created such that "when the vacuum source is operated" a "suction force is created," "waste [is] remov[ed]" and "treatment material [is] drawn" only in the hands of the ultimate user.**

The claims of the '052 Patent are written such that the final user of the product is the direct infringer. The limitations of the first independent claim requires that certain actions happen "when" it is activated: a suction force is created (which only occurs if the tip is positioned correctly on the body), waste is removed from the skin (which only occurs if a body is being treated), and treatment material is drawn from the containers (which only occurs if the bottles are filled, among other things). The last independent claim draws waste "during a procedure." Cartessa is a reseller. It does not complete this system such that the claimed actions happen "when the vacuum is activated," nor does it perform any "procedures." Cartessa cannot be a direct infringer.

**1.     This case is controlled by *Cross Medical Products v. Medtronic***

A patent is not infringed unless a "each and every limitation" appears in the accused product. *Cross Medical Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293 (Fed. Cir. 2005). In *Cross Medical*, a medical device was sold to providers who put them in operation. The system claims were written such that the system was completed when the devices were used – there, connected to the bone. Because "each and every limitation" was not met until the doctors employed the devices, the seller of the products did not complete the claimed system.

Likewise, the independent claims at issue require a system arranged such that "when the vacuum source is activated," "suction force" is created, "waste" is removed and "treatment media"

is drawn from the containers (claim 1), and "during a procedure" waste is removed (claim 11). That system is not completed until the aestheticians put the product into use. As with *Cross Medical*, the claims are written such that the end user is the infringer.

The independent claims recite the following:

> wherein, **when the vacuum source is activated and the tip contacts the skin surface, a suction force is created within the waste conduit and along the tip, thereby removing waste from the skin surface via the waste conduit while drawing treatment material** from the first fluid container or the second fluid container to the tip via the supply conduit.

Ex. C, '052 Pat. Cl. 1 (emphasis added)

> **a waste conduit in fluid communication with the handpiece assembly to remove waste from a skin surface of a subject during a procedure,** wherein the waste conduit is operatively coupled to the vacuum source;

Ex. C, '052 Pat. Cl. 11. The above limitations are met, if at all, by the end users. When an aesthetician puts a device into operation, given she has filled each of the bottles with treatment serum and otherwise placed the device in operable configuration, then, "when the vacuum source is activated and the tip contacts the skin surface" does the "suction force" get created, "waste" gets "remov[ed]," and "treatment material" is "draw[n]" from the containers. *See* Ex. C, '052 Pat. Cl. 1. Only "during a procedure" can the device "remove waste." *Id*. at Cl. 11. These conditions are only satisfied by the end user: when a vacuum is activated and the tip contacts the skin, suction force is created <u>only if</u> the operator holds the tip such that the tip "occludes" the opening (*i.e.*, is oriented such that the skin completes the seal around the tip), only if the device is contacting a body, and only if the fluid containers are filled. Without those acts suction force is *not* created, waste is *not* removed, and treatment material is *not* drawn "when the vacuum source is activated."

**2.      The treatment-related clauses are limiting, and all limitations must be met for infringement.**

The above-bolded clauses are limiting and therefore they must be met for infringement.

18

The patentee filed a Request for Continued Examination proposing the added language to the two independent claims. Ex. N at EDGE-CARTESSA_0001814-1820; *see also id*. at EDGE-CARTESSA_0001822 (amendments were presented to "overcome the present rejections").

The Courts consistently treat limitations added to avoid prior art as limiting. *Allergan Sales, LLC v. Sandoz, Inc.*, 935 F.3d 1370, 1376 (Fed. Cir. 2019) (clauses added to avoid prior art are limiting); *Desenberg v. Google, Inc.*, 392 F. App'x 868, 871 (Fed. Cir. 2010) (no direct infringement by Google because "wherein" clauses were performed by third parties).

Plaintiff has treated the language as limiting, including consistent allegations of the Accused Devices meeting the limitations throughout this case. *See* Ex. S, Pl. Infr. Cont. at 36-39 (Cl. 1), 43-47 (Cl. 11); Ex. H, Exp. Rpt. R. Meyst at 92-98 (Cl. 1), 114-116 (Cl. 11).

### 3.    The final system is not accomplished by Cartessa.

Cartessa is a supplier of the Accused Device. There is no evidence Cartessa ever activates a vacuum source, contacts a tip to skin surface, removes waste, or draws treatment material. Plaintiff's experts focus on third parties to complete the claimed systems. Dr. Duboys explains Cartessa encourages *a user* to complete the language of the claims. He correctly opines that particular post-Cartessa configuration "is necessary" to meet the infringing state:

> 104. In my opinion, in order to perform a skin treatment on a patient using the Accused Device, **a user** would need to position the handpiece of the Accused Device against the patient's skin to initiate contact and treatment. The Defendant's User Manual, Brochure, and videos teach that the Accused Device should be used in this way. Indeed, without contact, the device cannot treat skin, as **contact is necessary for solution to be delivered to the skin**.

Ex. T, Exp. Rpt. E. Duboys at ¶104. He ties this "necessary" behavior to both independent claims of the '052 Patent. *See id*. at ¶103. This reliance on third parties to complete the system is not isolated. As Dr. Duboys' repeatedly opines, Defendant at most "teach[es]" or "instructs" *others* to complete the system. *Id*. at ¶104, 105, 106, 121. He expressly negates direct infringement: "Indeed,

4876-1197-4201.v1

without contact, the device cannot treat skin **as contact is necessary for solution to be delivered to the skin**." *Id*. (emphasis added). Mr. Meyst acknowledges the same. *See* Ex. G, Dep. R. Meyst at 268:9-269:17 (the fluid must be filled and other steps performed before limitations are met); 267:5-12 (liquid is not in the container in Cartessa's possession). Mr. Meyst agrees the '052 Patent claims cannot be complete "until the fluid is in the container" and "[w]ithout the fluid it will – it can't deliver fluid so it is a necessary part." *Id*. at 269:13-17. Cartessa does not do this. *See id*. at 265:16-266:8. The claimed system "require[s]" fluid so that it could "draw treatment material" as required by claim 1. Ex. G, Dep. R. Meyst at 270:6-15. The inventor of the '052 Patent, Mr. Ignon, agrees that the limitation can occur only in use – positioning the tip on the skin such that a seal is formed – to circulate the fluid via vacuum. Ex. L, Dep. R. Ignon at 221:25-223:8. As with the defendants in *Cross Medical*, Cartessa ships the products for others to use. The last steps of assembling the system (*e.g.*, positioning the device such that "*when* the vacuum source is activated," a "suction force is created," it "draw[s] treatment material" and "removes waste") if they occur at all, are performed by the ultimate user.

Cartessa never completes a system such that "when the vacuum source is active" "treatment media" is drawn and "waste" is "remov[ed]." Likewise, Cartessa is never performing a "procedure" that "remove[s]" "waste." Because Cartessa does not achieve those limitations, it does not infringe the '052 Patent.

### III.    CONCLUSION

For at least the reasons set for above, Cartessa requests that the Court grant summary judgment of noninfringement. Because there is no evidence of infringement under the doctrine of equivalents, nor allegation of indirect infringement, all of Plaintiff's claims related to the '052 Patent should be dismissed.

20

Respectfully submitted,

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

DATED: October 13, 2022

By: /s/ Steven Tepera

    Steven Tepera (24053510)
    steven.tepera@pillsburylaw.com
    Aya Hatori
    aya.hatori@pillsburylaw.com
    401 Congress Avenue, Suite 1700
    Austin, TX 78701-3797
    Phone: +1.512.580.9651
    Fax: 512.580.9601

    David G. Keyko (New York Bar No. 1309814)
    david.keyko@pillsburylaw.com
    31 West 52nd Street
    New York, NY 10019-6131
    Tel.: 212-858-1604
    Fax: 212-858-1500

    *Attorneys for Defendant:*
    *Cartessa Aesthetics, LLC*

21

4876-1197-4201.v1